**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————

**No. 21-1858**

———————

IN RE: KAISER GYPSUM COMPANY, INC.; HANSON PERMANENTE CEMENT, INC.,

        Debtors.

———————————————————

TRUCK INSURANCE EXCHANGE,

        Plaintiff – Appellant,

   v.

KAISER GYPSUM COMPANY, INC.; HANSON PERMANENTE CEMENT, INC.,

        Debtors – Appellees,

   and

LEHIGH HANSON, INC.,

        Defendant – Appellee,

   and

OFFICIAL COMMITTEE OF ASBESTOS PERSONAL INJURY CLAIMANTS; FUTURE CLAIMANTS REPRESENTATIVE,

        Appellees.

———————

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Graham C. Mullen, Senior District Judge.  (3:20-cv-00537-GCM)

———————

Argued:  October 25, 2022                    Decided:  February 14, 2023

_____

Before KING, AGEE and QUATTLEBAUM, Circuit Judges.

_____

Affirmed by published opinion.  Judge Agee wrote the opinion in which Judge King and Judge Quattlebaum joined.

_____

**ARGUED:**  Allyson Newton Ho, GIBSON, DUNN & CRUTCHER, LLP, Dallas, Texas, for Appellant.  C. Kevin Marshall, JONES DAY, Washington, D.C.; Kevin C. Maclay, CAPLIN & DRYSDALE, CHARTERED, Washington, D.C.; Edwin J. Harron, YOUNG, CONAWAY, STARGATT & TAYLOR, Wilmington, Delaware, for Appellees.  **ON BRIEF:**  Michael A. Rosenthal, Michael K. Gocksch, New York, New York, David W. Casazza, Washington, D.C., Robert B. Krakow, Russell H. Falconer, Elizabeth A. Kiernan, Dallas, Texas, Matthew G. Bouslog, GIBSON, DUNN & CRUTCHER LLP, Irvine, California; Michael L. Martinez, GRIER WRIGHT MARTINEZ, PA, Charlotte, North Carolina; Scott R. Hoyt, PIA ANDERSON MOSS HOYT, LLC, Salt Lake City, Utah, for Appellant.  Todd E. Phillips, James P. Wehner, CAPLIN & DRYSDALE, CHARTERED, Washington, D.C.; Sara (Sally) W. Higgins, Raymond E. Owens, Jr., HIGGINS & OWENS, PLLC, Charlotte, North Carolina, for Appellee the Official Committee of Asbestos Personal Injury Claimants.  James L. Patton, Jr., Sharon M. Zieg, Sara Beth A.R. Kohut, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Felton E. Parrish, John M. "Jack" Spencer, ALEXANDER RICKS PLLC, Charlotte, North Carolina, for Appellee Lawrence Fitzpatrick the Future Claimants' Representative.  Robert M. Horkovich, ANDERSON KILL PC, New York, New York for Appellees the Official Committee of Asbestos Personal Injury Claimants and the Future Claimants' Representative.  Gregory M. Gordon, Amanda Rush, Dallas, Texas, Daniel C. Villalba, Washington, D.C., Paul M. Green, JONES DAY, Houston, Texas; Ross R. Fulton, John R. Miller, Jr., RAYBURN COOPER & DURHAM, P.A., Charlotte, North Carolina, for Appellees Kaiser Gypsum Company, Inc. and Hanson Permanente Cement, Inc.  Mark A. Nebrig, MOORE & VAN ALLEN PLLC, Charlotte, North Carolina, for Appellee Lehigh Hanson, Inc.

_____

2

AGEE, Circuit Judge:

This bankruptcy appeal involves a primary insurer's attempts to block its insureds' Chapter 11 reorganization plan (the "Plan"), which establishes a trust under 11 U.S.C. § 524(g) for current and future asbestos personal-injury liabilities. In adopting the bankruptcy court's recommendation to confirm the Plan, the district court concluded in relevant part that the primary insurer was not a "party in interest" under 11 U.S.C. § 1109(b) and thus lacked standing to object to the Plan. Having carefully considered the parties' briefs and the record, we affirm, but we do so on both § 1109(b) grounds and Article III grounds.

I.

A.

Enacted as part of the Bankruptcy Reform Act of 1994, Pub. L. No. 103-394, 108 Stat. 4106, § 524(g) of the Bankruptcy Code allows a Chapter 11 debtor with substantial asbestos liabilities to obtain a channeling injunction that diverts all asbestos claims, current and future, to a trust established by the debtor's reorganization plan and funded by the debtor. *See* 11 U.S.C. § 524(g)(1)–(2). In formulating § 524(g), Congress sought to ensure equitable treatment for future claimants who, because of the long latency period associated with some asbestos-related illnesses, may not know of their claims until years after the bankruptcy. *See In re W.R. Grace & Co.*, 13 F.4th 279, 283 (3d Cir. 2021); *In re Quigley Co.*, 676 F.3d 45, 58–59 (2d Cir. 2012); *see also* H.R. Rep. No. 103-835, at 40. At the same time, Congress also sought to enable the debtor, who would otherwise face an unknown

3

but potentially large number of future claims, to emerge from bankruptcy as an economically viable entity. *See W.R. Grace & Co.*, 13 F.4th at 283; *see also* H.R. Rep. No. 103-835, at 40–41.

For a debtor to obtain § 524(g) relief, several statutory criteria must be met, most of which are designed to safeguard "the due process rights" of claimants, particularly future claimants. *In re Grossman's Inc.*, 607 F.3d 114, 127 (3d Cir. 2010) (quoting *In re Combustion Eng'g, Inc.*, 391 F.3d 190, 234 n.45 (3d Cir. 2004)); *see* 11 U.S.C. § 524(g)(2)(B), (4)(B). For example, the court must appoint a representative to protect the interests of future claimants during the reorganization, 11 U.S.C. § 524(g)(4)(B)(i), and must determine that the plan treats "present claims and future demands that involve similar claims in substantially the same manner," *id.* § 524(g)(2)(B)(ii)(V); *see also id.* § 524(g)(4)(B)(ii) (stating that the court must find that the channeling injunction is "fair and equitable" to future claimants). Additionally, 75 percent of current claimants must vote to approve the plan. *Id.* § 524(g)(2)(B)(ii)(IV)(bb).

## B.

Debtors-Appellees Kaiser Gypsum Company, Inc., and Hanson Permanente Cement, Inc., (collectively, the "Debtors") used to manufacture and sell asbestos-containing products. Since 1978, the two sister companies have been named in over 38,000 asbestos-related lawsuits nationwide. Despite maintaining liability insurance, the Debtors' outstanding asbestos liabilities combined with the risk of unknown future asbestos claims, including claims for punitive damages, drove the Debtors to seek Chapter 11 relief in 2016, at which time 14,000 lawsuits remained pending.

Following extensive negotiations with multiple parties, including several insurance companies, various creditors and government agencies, and court-appointed representatives of current and future asbestos claimants,[1] the Debtors arrived at the nearly consensual proposed Plan of reorganization. The Plan would establish a § 524(g) trust to resolve the Debtors' present and future asbestos personal-injury liabilities, with a channeling injunction to protect the Debtors from future asbestos claims, including claims for punitive damages, in the state and federal tort systems nationwide.

Critical to the trust's viability were the Debtors' rights under certain primary liability insurance policies issued by Appellant Truck Insurance Exchange ("Truck") from the 1960s through the 1980s. Under those policies, Truck must investigate and defend each covered asbestos personal-injury claim or suit asserted against the Debtors, "even if such claim or suit is groundless, false or fraudulent." J.A. 792. Truck must also indemnify the Debtors for each such claim up to a per-claim limit, typically $500,000 per claim,[2] excluding punitive damages. Importantly, Truck's primary coverage applies on a per-claim basis without a maximum aggregate limit, meaning that Truck's coverage is non-eroding, subject only to the $500,000 per-claim limit. The policies further specify that "[b]ankruptcy or insolvency of the [Debtors] or of the [Debtors'] estate[s] shall not relieve [Truck] of any of its obligations hereunder." J.A. 804. As for the Debtors, the policies require them to pay

---

[1] These include Appellee Official Committee of Asbestos Personal Injury Claimants and Appellee Future Claimants' Representative.

[2] The Debtors maintained excess insurance coverage that would respond to amounts exceeding the per-claim limit of their primary coverage.

a deductible, typically $5,000 per claim, and to assist and cooperate with Truck in defending against asbestos claims asserted against them.

As part of the proposed reorganization Plan, the Debtors would assign their rights under the Truck policies to the § 524(g) trust. Those rights to non-eroding coverage, along with a one-time $49 million contribution by parent company Appellee Lehigh Hanson, Inc., and a secured five-year $1 million note issued by the Debtors, would provide the funding for the trust.

Structured to capitalize on the Truck policies, the proposed Plan provided that holders of *insured* asbestos personal-injury claims—claims that fall within available insurance coverage—would continue to assert actions against the reorganized Debtors, in name only, in the tort system to collect available insurance. Importantly, these claims would still be subject to all the insurers' pre-petition coverage defense rights—including the right to deny coverage should the Debtors fail to honor their assistance-and-cooperation obligations. If a claimant were to obtain a favorable judgment, the trust would pay the deductible, and Truck, pursuant to its coverage obligations under the policies, would pay up to the per-claim limit.

Holders of *uninsured* asbestos personal-injury claims—claims that fall outside available insurance coverage—would submit their claims directly to the trust for resolution through an administrative process. As part of that process, each claimant would have to provide certain disclosures and authorizations that would help ensure that the trust paid only valid, non-duplicative claims. In particular, a claimant would have to provide specific information regarding all other claims that relate in any way to the alleged asbestos injury

6

and would also have to authorize the trust to obtain the claimant's submissions, if any, to other asbestos trusts.[3] After an individualized assessment of a particular uninsured claim, the trust could respond with a settlement offer, which the claimant could accept or reject.

Aside from the asbestos personal-injury claims, the proposed Plan would resolve the Debtors' other outstanding liabilities. For example, the Plan would settle the Debtors' decades-old asbestos-related environmental liabilities. It would also satisfy, in full, all general unsecured creditor claims, including a claim held by Truck for unpaid deductibles under the policies.

Consequently, the only remaining "impaired" class of creditors under the proposed Plan would be the asbestos personal-injury claimants, whose claims would be addressed by the trust.

C.

Following a vote, 100 percent of the asbestos personal-injury claimants approved the proposed Plan. The Plan also had unanimous support from all the other parties involved in the bankruptcy, save one—Truck.

Truck's chief objection to the Plan was that it did not require holders of *insured* claims, who would continue to pursue their claims in the tort system, to provide the same disclosures and authorizations that the Plan required of holders of *uninsured* claims. In other words, the Plan would provide "anti-fraud" protections to the trust in resolving

---

[3] The initial version of the Plan did not require these disclosures and authorizations, but the Debtors added them after the bankruptcy judge expressed concern about their absence.

7

uninsured claims but not to Truck in resolving insured claims. Truck contended that this disparate treatment would expose it to millions of dollars in fraudulent tort claims.

Despite Truck's insistence that the Debtors add these anti-fraud measures for insured claims to be litigated in the tort system, the Debtors declined to disturb the already negotiated Plan and proceeded to seek court approval. Truck in turn sent the Debtors a reservation-of-rights letter stating that the Debtors' proposed Plan "appear[ed] to be collusive and in violation of [the Debtors'] duty to cooperate and assist" under the Truck policies. J.A. 864.

Following receipt of Truck's letter, the Debtors sought, in conjunction with confirmation of the Plan, a judicial determination that their conduct in negotiating and drafting the Plan did not transgress their assistance-and-cooperation obligations under the Truck policies or breach the implied covenant of good faith and fair dealing—a proposed finding termed the "Plan Finding."

Truck responded by filing a separate declaratory judgment action seeking the opposite judicial pronouncement—that the Debtors' bankruptcy conduct *did* violate the Truck policies' assistance-and-cooperation provision and the implied covenant of good faith and fair dealing; that the Debtors were not entitled to the Plan Finding; and that Truck should thereby be relieved of its coverage obligations. The district court stayed Truck's action pending the bankruptcy court's recommendation regarding whether to confirm the proposed Plan.

8

D.

After extensive briefing by the parties, the bankruptcy court held a hearing on the proposed Plan. Both in the briefing and at the hearing, Truck raised three main objections to confirmation. First, Truck contended that the Plan was not proposed in good faith, as required for all plans of reorganization under 11 U.S.C. § 1129(a)(3), because it reflected a collusive agreement between the Debtors and the claimant representatives to perpetuate fraudulently inflated recoveries in the tort system. Second, Truck argued that the proposed Plan Finding would impermissibly alter its rights under the policies by relieving the Debtors of their assistance-and-cooperation obligations and by barring Truck from raising the Debtors' bankruptcy conduct as a defense in future coverage disputes. And third, Truck claimed that the proposed trust did not comply with several § 524(g) requirements.

At a subsequent hearing, the bankruptcy court issued an oral ruling, later memorialized in writing, setting forth proposed findings of fact and conclusions of law and recommending confirmation of the Plan.

The bankruptcy court first observed that, as an insurer, Truck had standing to challenge the proposed Plan only to the extent that it was not "insurance neutral." In its analysis, the court found that the Plan didn't alter Truck's rights or obligations under the policies and therefore deemed the Plan insurance neutral. As a result, the bankruptcy court concluded that Truck was not a "party in interest" under 11 U.S.C. § 1109(b)[4] and thus

_____

[4] Section 1109(b) provides that "[a] party in interest . . . may raise and may appear and be heard on any issue in a [Chapter 11] case." 11 U.S.C. § 1109(b).

lacked standing to challenge other aspects of the Plan, including whether the Plan was proposed in good faith and whether the trust complied with § 524(g). The bankruptcy court also found that Truck's additional status as a general unsecured creditor did not confer § 1109(b) standing because all general unsecured claims would be fully satisfied under the Plan.

In nonetheless considering Truck's objections on the merits, the bankruptcy court rejected them, finding that the trust satisfied § 524(g)'s requirements and that the Plan, which was extensively negotiated and maximized the Debtors' available assets to satisfy claims, was proposed in good faith. In arriving at its good-faith finding, the bankruptcy court dismissed as purely speculative Truck's claim that unchecked rampant fraud would define the resolution of insured claims in the tort system absent the proposed anti-fraud measures. The bankruptcy court further determined that any effort to implement those measures would improperly invade the province of other federal and state courts by mandating "what kind of discovery is required in asbestos cases." J.A. 6639.

Following a de novo review, complete with additional briefing and a hearing, the district court confirmed the Plan over Truck's renewed objections. *See In re Kaiser Gypsum Co.*, No. 16-31602 (JCW), 2021 WL 3239513 (W.D.N.C. July 28, 2021) (confirmation order); *In re Kaiser Gypsum Co.*, No. 16-31602 (JCW), 2021 WL 3215102 (W.D.N.C. July 28, 2021) (findings of fact and conclusions of law). In doing so, the district court adopted the bankruptcy court's findings of fact and conclusions of law in all material respects, thereby foreclosing Truck's requested declaratory relief. The district court also denied Truck's motion for a stay pending appeal.

Truck timely appealed, and we likewise denied Truck's request for a stay. Thereafter, the Debtors, joined by their parent Lehigh Hanson, moved to dismiss the appeal, asserting both that Truck lacks bankruptcy appellate standing to challenge the Plan and that the appeal is equitably moot.

Because the district court's order confirming the Plan is a final order, we have jurisdiction over this appeal under 28 U.S.C. § 1291.

## II.

We begin with the Debtors' contention that Truck lacks bankruptcy appellate standing to challenge the Plan.

Under this circuit's "well-established" doctrine of bankruptcy appellate standing, only a "person aggrieved"—that is, a party "directly and adversely affected pecuniarily"— by a bankruptcy order may appeal that order. *In re Urb. Broad. Corp.*, 401 F.3d 236, 243– 44 (4th Cir. 2005) (quoting *In re Clark*, 927 F.2d 793, 795 (4th Cir. 1991)).[5]

---

[5] As we explained in *Clark*, this doctrine of bankruptcy appellate standing, sometimes called the "person aggrieved" test, derives from the original Bankruptcy Code, which permitted only a "person aggrieved" to appeal a bankruptcy order. 927 F.2d at 795 (citing 11 U.S.C. § 67(c) (1976) (repealed 1978)). And as we also explained in *Clark*, although that specific textual limitation was later repealed, courts, including this one, "continue[] to use the test." *Id.* This continued use reflects a judicial recognition "that Congress [did not] intend[] to alter the right to appellate review by leaving undefined in the Code the requisites for standing." *In re Fondiller*, 707 F.2d 441, 443 (9th Cir. 1983); *accord In re Westwood Cmty. Two Ass'n*, 293 F.3d 1332, 1334 (11th Cir. 2002) ("Our sister circuits have agreed that, although Congress did not define who has standing to appeal in the Bankruptcy Code, no evidence exists that Congress intended to alter the definition set forth in the prior law, the Bankruptcy Act of 1898.").

11

According to the Debtors, Truck is not a person aggrieved by confirmation of the Plan because neither the Plan's lack of fraud-prevention measures for insured claims litigated in the tort system nor the Plan Finding directly and pecuniarily harms Truck. Rather, the Debtors say, Truck's alleged harm hinges on the progression and outcome of future litigation and thus is not a direct harm sufficient for bankruptcy appellate standing.

Truck responds that the Supreme Court foreclosed further application of the person-aggrieved test in *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). According to Truck, *Lexmark* rejected prudential forms of standing like bankruptcy appellate standing. But even if that standard survived *Lexmark*, Truck continues, it has satisfied it here.

We need not address these specific arguments as presented by the parties. This is because whatever its ability to show a direct and pecuniary harm resulting from confirmation of the Plan, Truck indisputably has standing to appeal the district court's conclusion that it lacked § 1109(b) standing, either as an insurer or as a creditor, to challenge the Plan in the first instance. Indeed, as the Third Circuit has explained, bankruptcy appellate standing refers to "standing to appeal the *substance* of the bankruptcy court's decision," which is "distinct from standing to appeal the bankruptcy court's decision regarding bankruptcy standing" under § 1109(b). *In re Glob. Indus. Techs., Inc.*, 645 F.3d 201, 209–10 n.23 (3d Cir. 2011) (en banc) (emphasis added).

By finding that Truck was not a party in interest under § 1109(b), the district court denied Truck standing to otherwise object to the Plan in the first instance. Truck's seeking review of that determination therefore does not equate to an appeal of the "substance" of

the Plan, which would trigger the rigorous requirements of bankruptcy appellate standing. Rather, it's an appeal of an adverse § 1109(b) standing determination. That being the case, the bankruptcy appellate-standing doctrine is not implicated. *See id.* ("[A] party denied standing to sue, or to intervene, or to object, may obviously appeal such a determination." (quoting *In re Pittsburgh & Lake Erie R.R. Co. Sec. & Antitrust Litig.*, 543 F.2d 1058, 1064 (3d Cir. 1976))). To otherwise hold that a party must satisfy the more-exacting person-aggrieved standard to appeal a lower court's determination that the party lacked standing to challenge plan confirmation in the first instance "would risk leaving parties in interest who have been erroneously denied bankruptcy standing, but who do not meet the more stringent requirements for appellate standing, without legal redress for that error." *Id.* We do not erect such a barrier to redress here, and our decisions in *Clark* and *Urban Broadcasting*—neither of which involved facts like those presented here—don't counsel otherwise.

Because the district court's § 1109(b) findings denied Truck standing to object to the Plan at the outset, Truck has standing to appeal *those* findings, to which we now turn.[6]

### III.

The district court held that Truck, as an insurer, was not a party in interest with standing to challenge the Plan because it was insurance neutral and therefore did not affect

---

[6] We thus have no occasion to assess *Lexmark*'s effect, if any, on this circuit's bankruptcy appellate-standing jurisprudence. We also decline to consider the Debtors' equitable-mootness defense as it is similarly unnecessary to our resolution of this appeal.

Truck's rights or obligations under the subject policies. As part of that insurance-neutrality determination, the district court made the Plan Finding, an affirmative declaration that the Debtors' conduct in bankruptcy—namely, their agreeing to a plan that lacked Truck's desired anti-fraud measures for insured claims litigated in the tort system—breached neither the Debtors' assistance-and-cooperation obligations under the Truck policies nor the implied covenant of good faith and fair dealing. The district court also determined that Truck's additional status as a creditor did not independently render Truck a party in interest because Truck's claim was fully satisfied under the Plan.

These findings are legal conclusions that we review de novo. *See Foodbuy, LLC v. Gregory Packaging, Inc.*, 987 F.3d 102, 115, 118 (4th Cir. 2021); *see also In re Thorpe Insulation Co.*, 677 F.3d 869, 879 (9th Cir. 2012).

### A.

Under § 1109(b), "[a] party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under [Chapter 11]." 11 U.S.C. § 1109(b).

Our prior cases have not closely examined the scope of § 1109(b), but other courts have held that the statutory list of potential parties in interest is not exhaustive. *See, e.g.*, *In re Tower Park Props.*, 803 F.3d 450, 457 (9th Cir. 2015). Instead, that list reflects an understanding that a "party in interest" includes "anyone who has a legally protected interest that could be affected by a bankruptcy proceeding." *In re James Wilson Assocs.*, 965 F.2d 160, 169 (7th Cir. 1992); *accord Glob. Indus. Techs.*, 645 F.3d at 210. This

14

interpretation of the statute tracks our general recognition that "the term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle." *United States v. Hawley*, 919 F.3d 252, 256 (4th Cir. 2019) (quoting *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941)).

Viewed through that lens, a party in interest could include a debtor's insurer. In determining whether a particular reorganization plan sufficiently affects an insurer's legal rights to render that insurer a party in interest, courts typically look to see whether the plan is "insurance neutral." *See, e.g.*, *Glob. Indus. Techs.*, 645 F.3d at 212. A plan is insurance neutral if it doesn't increase the insurer's pre-petition obligations or impair the insurer's pre-petition policy rights. *Id.* (citing *Combustion Eng'g*, 391 F.3d at 218). Stated another way, a plan is insurance neutral if it "does not materially alter the quantum of liability that the insurer[] would be called to absorb." *Id.* If a plan is insurance neutral, the objecting insurer ordinarily is not a party in interest under § 1109(b) and thus lacks standing to challenge the substance of the Plan. *See id.*

Here, the district court held that the Plan was insurance neutral because it expressly preserved Truck's coverage defenses and the Debtors' assistance-and-cooperation obligations under the policies, thereby placing Truck in the same position as it was pre-bankruptcy. Part and parcel of that determination was the Plan Finding, which the district court found appropriate and necessary given Truck's assertion that the Debtors' bankruptcy conduct violated the policies' assistance-and-cooperation provision and thereby voided coverage.

15

Although the Plan includes an "Insurance Neutrality" section expressly preserving Truck's pre-petition coverage defenses, J.A. 1711; *see also* J.A. 1704 (retaining the Debtors' assistance-and-cooperation obligations under the Truck policies), Truck argues that the Plan is not insurance neutral for two primary reasons. First, Truck asserts that the Plan Finding impermissibly alters Truck's policy rights by barring Truck from asserting future coverage defenses based on the Debtors' bankruptcy conduct. And second, Truck contends that the Plan reflects a scheme between the Debtors and the claimant representatives to expose Truck to fraudulent claims in the tort system. We address each contention in turn.[7]

i.

We first consider Truck's claim that the Plan Finding effectively rewrites the policies and impairs Truck's contractual rights. Because it is impossible to assert contractual rights that never existed in the first place, assessing Truck's claim necessarily requires determining whether the district court correctly held that the Debtors didn't breach their assistance-and-cooperation obligations or the implied covenant of good faith and fair dealing by agreeing to a plan that lacked Truck's desired anti-fraud measures. That inquiry, in turn, depends on the proper interpretation of the Truck policies under California law, the governing law as applicable to the policies.

---

[7] Were Truck to prove that the Plan is not insurance neutral, then clearly its rights as an insurer would be adversely affected. Accordingly, Truck has Article III standing to raise its insurance-neutrality arguments on appeal. *See Thorpe Insulation Co.*, 677 F.3d at 887. As discussed below, however, the same cannot be said of Truck's creditor-based § 1109(b) arguments, which assert only the interests of third parties.

In California, an insurance agreement is a contract to which the ordinary principles of contract interpretation apply. *Bank of the W. v. Super. Ct.*, 833 P.2d 545, 551–52 (Cal. 1992). Courts must therefore interpret an insurance policy's language in its "ordinary and popular sense," and in its proper context, with the goal of giving effect to the "mutual intention of the parties." *Id.* at 552.

Turning to the pertinent policy provision here, it provides:

**8.   ASSISTANCE AND COOPERATION OF THE INSURED:**

The insured shall cooperate with the company, and upon the company's request, shall attend hearings and trials and shall assist in effecting settlements, securing and giving evidence, obtaining the attendance of witnesses and in the conduct of suits. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of the occurrence.

J.A. 803.

According to Truck, the Debtors' obligations to "cooperate with [Truck]" and to "assist in effecting settlements [and] securing and giving evidence," J.A. 803, require the Debtors, in this bankruptcy proceeding, to help Truck secure the disclosures and authorizations it considers necessary to combat potential fraud in litigating insured claims in the tort system.

The district court rejected Truck's broad reading, finding instead that the provision requires the Debtors to assist and cooperate with Truck only in relation to "Truck's defense efforts in individual suits." *Kaiser Gypsum Co.*, 2021 WL 3215102, at *32. Notwithstanding Truck's urging that the provision's language is not so limited, we agree with the district court.

17

To begin, nothing in the policy provision suggests that the Debtors' assistance-and-cooperation obligations extend to bankruptcy-plan negotiations. True, the first sentence obligates the Debtors to "cooperate" with Truck and to assist Truck in "effecting settlements [and] securing and giving evidence." J.A. 803. But the same sentence also specifically speaks of "attend[ing] hearings and trials," "obtaining the attendance of witnesses," and "in the conduct of suits." J.A. 803. Taken together with "effecting settlements" and "securing and giving evidence," these activities—along with the phrase "in the conduct of suits"—indicate traditional litigation activities, as opposed to activities typically undertaken in a bankruptcy proceeding. *See Bank of the W.*, 833 P.2d at 552 (stating that "policy terms must be read in their ordinary and popular sense" (internal quotation marks omitted)).

In addition, the policy provision's second and final sentence, which Truck ignores altogether, discusses the Debtors' ability to "voluntarily make any payment, assume any obligation or incur any expense other than for such immediate medical and surgical relief to others as shall be imperative at the time of *the occurrence*." J.A. 803 (emphasis added). The term "occurrence," a well-known term of art in the insurance industry, *see, e.g.*, 9 Steven Plitt et al., Couch on Insurance § 126:29 (3d ed. 2022); *Occurrence*, Black's Law Dictionary (11th ed. 2019), is defined in the Truck policies as "an event, or *continuous or repeated exposure to conditions which results in personal injury* or property damage during the policy period," J.A. 801–02 (emphasis added). Utilizing that term in the assistance-and-cooperation provision is highly probative of the provision's intended scope—a scope limited to the defense of claims stemming from an "occurrence." *See Bank of the W.*, 833

18

P.2d at 552 (stating that a court "must interpret the language in context, with regard to its intended function in the policy").

The provision's precise placement in the policy reinforces this view. Immediately preceding the assistance-and-cooperation provision are two provisions that require the Debtors to notify Truck whenever "an occurrence takes place" and whenever a "claim is made or suit is brought against" the Debtors. J.A. 803. The assistance-and-cooperation provision's placement immediately after these two provisions is instructive contextual evidence that the Debtors' assistance-and-cooperation obligations are triggered only in response to an "occurrence"-based "claim" or "suit" brought against the Debtors—not in response to a bankruptcy declaration. *See Travelers Cas. & Sur. Co. v. Transcon. Ins. Co.*, 19 Cal. Rptr. 3d 272, 278 (Ct. App. 2004) (concluding that a provision's placement in an insurance policy supplied necessary context for policy interpretation); *cf. Campbell v. Regents of the Univ. of Cal.*, 106 P.3d 976, 988 (Cal. 2005) (interpreting a section of the California Labor Code and finding that the immediately preceding statutory sections provided interpretive context).

It's also informative that the cooperation language at issue arises out of a *general liability insurance policy*. Truck hasn't cited a single decision by *any* court holding that such a policy's cooperation provision encompassed an insured's conduct in proposing a reorganization plan in a bankruptcy proceeding. Indeed, when pressed on this point at oral argument, Truck's counsel conceded that the provision here is a "standard provision that so far as I'm aware has never been [alleged] to apply in a circumstance like this." Oral Argument at 5:36–7:01, https://www.ca4.uscourts.gov/OAarchive/mp3/21-1858-

19

20221025.mp3. Absent cognizable evidence to the contrary, which is not present here, we cannot conclude that the policy provision at issue has the broad reach that Truck posits. *See Admiral Ins. Co. v. Grace Indus., Inc.*, 409 B.R. 275, 283 (E.D.N.Y. 2009) (holding that a similar cooperation clause required the debtor-insured only to assist its insurer "in the ultimate disposition of the actual claims, not to take on [its insurer as] a partner" in its own bankruptcy proceeding).

Considering both the immediate and broader context, we have little doubt that an ordinary reader would understand that any activities required under the assistance-and-cooperation clause are those that the parties intended the Debtors to perform in assisting Truck in the defense against individual claims triggering coverage under the policies. The Debtors could not have reasonably expected otherwise when they purchased those policies. And nothing in the Plan purports to alter the presentation of a claim on the merits in tort-system litigation on the part of the claimants, the Debtors, or Truck.

We therefore agree with the district court that the Debtors did not breach their assistance-and-cooperation obligations under the Truck policies by proffering a reorganization plan that lacked Truck's desired fraud-prevention measures. We likewise agree that the Debtors did not breach the implied covenant of good faith and fair dealing as that claim is premised on the same conduct just discussed. *See McKnight v. Torres*, 563 F.3d 890, 893 (9th Cir. 2009) (stating that California's implied covenant of good faith and fair dealing "is limited to assuring compliance with the express terms of the contract, and

20

cannot be extended to create obligations not contemplated by the contract" (quoting *Spinks v. Equity Residential Briarwood Apartments*, 90 Cal. Rptr. 3d 453, 477 (Ct. App. 2009))).[8]

Given these conclusions, we reject Truck's assertion that the Plan Finding alters Truck's policy rights. Simply put, those alleged rights never existed under the policies. As a result, the Plan Finding, which merely resolved a confirmation objection by Truck (an objection, we note, that would not exist independent of the bankruptcy proceeding), does not pose an obstacle to insurance neutrality.[9]

ii.

Truck's second argument—that the Plan is not insurance neutral because it facilitates fraudulent claims against Truck in the tort system—fares no better. The basis for

---

[8] Truck argues that it is entitled to have a jury decide these issues. We disagree. As stated above, whether the Debtors' conduct in bankruptcy violated the Truck policies' assistance-and-cooperation provision turns not on any disputed fact but on the correct interpretation of the unambiguous policy provision, a pure question of law. *See MacKinnon v. Truck Ins. Exch.*, 73 P.3d 1205, 1212 (Cal. 2003).

[9] Truck suggests that, in adopting the bankruptcy court's recommendation to confirm the Plan, the district court overstepped its bounds by giving preclusive effect to the Plan Finding, thereby stripping Truck of a critical coverage defense in the tort system. But that argument assumes that such a defense is available under the Truck policies. And as explained above, it isn't as to the Debtors' conduct in preparing and presenting the Plan for confirmation. More to the point, the district court could not have confirmed the Plan unless the Plan Finding was prospectively binding on Truck given that the assignment of the Debtors' coverage rights under the Truck policies is essential to the trust's viability and thus to the overall success of the Plan. Permitting Truck to later raise the Debtors' bankruptcy conduct as a coverage defense in individual suits across the country would defeat the reorganization's entire purpose and create inequitable results for claimants. The district court thus acted well within its authority in giving preclusive effect to the Plan Finding to avoid such an outcome. *See* 11 U.S.C. § 105(a) (empowering a court in bankruptcy to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code).

this claim is the Plan's lack of fraud-prevention measures for insured claims that are to be resolved in the tort system. But what Truck fails to acknowledge is that it was not entitled to those measures before the bankruptcy proceeding. To the contrary, the Truck policies specifically obligate Truck to "[i]nvestigate and defend any claim or suit against the [Debtors] . . . *even if such claim or suit is groundless, false or fraudulent*." J.A. 792 (emphasis added). By not instituting Truck's desired anti-fraud measures, therefore, the Plan in no way alters Truck's pre-bankruptcy "quantum of liability," *Glob. Indus. Techs.*, 645 F.3d at 212; it merely retains Truck's decades-old pre-petition coverage obligations (and defenses). That the Plan doesn't instead seek to now limit Truck's potential liability exposure in the tort system provides no basis to conclude that the Plan isn't insurance neutral. To hold otherwise would expand the Debtors' obligations under the policies and grant Truck broad license to dictate the terms of the Debtors' own bankruptcy reorganization. We do not approve such a result.

* * * *

Because the Plan does not impair Truck's policy rights or otherwise alter Truck's quantum of liability but simply maintains Truck in its pre-petition position with all its coverage defenses intact, the Plan is insurance neutral. Accordingly, we hold that Truck, in its capacity as an insurer, is not a party in interest under § 1109(b) and therefore lacks standing to challenge the Plan in that capacity.

B.

Aside from its status as the Debtors' insurer, Truck argues that it is a party in interest with standing to challenge the Plan because it is (or at least was prior to confirmation of

22

the Plan) one of the Debtors' creditors. As set out above, § 1109(b) states that a party in interest, including "a creditor," may raise and be heard on "any issue" in a Chapter 11 case. 11 U.S.C. § 1109(b). And because it is "a creditor," Truck says that the statute confers on it an unrestricted right to raise and be heard on "any issue," regardless of whether that issue impacts it in any way. In Truck's view, therefore, whether the Plan was proposed in good faith under 11 U.S.C. § 1129(a)(3) and whether the trust satisfies § 524(g)'s requirements are issues that Truck can challenge regardless of any nexus between those issues and Truck's legally protected interests.

The Debtors disagree. Pointing to the Seventh Circuit's decision in *James Wilson Associates*, the Debtors insist that § 1109(b) does not grant an entity standing to object to aspects of a reorganization plan that do not affect its legally protected interests. *See James Wilson Assocs.*, 965 F.2d at 169 ("We think all [§ 1109(b)] means is that anyone who has a legally protected interest that could be affected by a bankruptcy proceeding is entitled to assert that interest with respect to any issue to which it pertains."). To that end, the Debtors argue that because Truck's general unsecured claim is fully satisfied under the Plan, Truck's status *as a creditor* is insufficient to satisfy § 1109(b)'s party-in-interest requirement.

But we need not decide this issue because, even if its claim is consistent with the text of § 1109(b), Truck still must have Article III standing to press its objections. *See*

23

*Thorpe Insulation Co.*, 677 F.3d at 887; *Glob. Indus. Techs.*, 645 F.3d at 210.[10] And Truck does not raise any objections relating to its interests as a creditor, which is no surprise given that its only claim is fully satisfied under the Plan. Rather, Truck's objections either relate to its interests as an *insurer* or don't implicate its interests at all, such as the Plan's good-faith basis and the trust's compliance with § 524(g). In these circumstances, we fail to see how Truck has alleged any injury in fact as a creditor—and an unimpaired one at that— giving it Article III standing to object to aspects of a reorganization plan that in no way relate to its status *as a creditor* but instead implicate only the rights of third parties (who actually *support* the Plan). *See Warth v. Seldin*, 422 U.S. 490, 499 (1975) (stating that to establish Article III standing, a party "generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties").

## C.

In sum, as an insurer, Truck fails to show that the Plan impairs its contractual rights or otherwise expands its potential liability under the subject insurance policies, so it is not a party in interest under § 1109(b) with standing to challenge the Plan in that capacity. Similarly, as a creditor, Truck objects to parts of the Plan that implicate only the rights of

---

[10] We recognize that courts are split on the interplay of Article III and § 1109(b). *Compare Glob. Indus. Techs.*, 645 F.3d at 211 (observing that "Article III standing and standing under the Bankruptcy Code are effectively coextensive"), *with Tower Park Props.*, 803 F.3d at 457 n.6 (declining to "collapse the § 1109(b) requirements into Article III standing"). But we need not choose a side here. Whether or not Article III standing is coextensive with § 1109(b) standing, Article III standing is still required in every case. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) ("[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III.").

24

third parties, which fails to allege an injury in fact sufficient to confer Article III standing.

Accordingly, none of Truck's objections to the Plan can survive.

## IV.

For these reasons, we affirm the district court's judgment.

*AFFIRMED*